would you pay without it because then you don't even have a product. So this is at least an unusual situation, and it is consistent with the, you keep saying it's consistent with their theory of the case, the plaintiffs, and it actually isn't. I mean, the complaint says that the damages, they suffer concrete and particularized harm, which includes lost money, wasting plaintiff's time, and the stress, aggravation, frustration, loss of trust, loss of serenity, and loss of confidence in product labeling was part of their injury. So it's not inconsistent with their theory, and it may be not the usual theory, but it's not the usual case either because the entire product depends on this being oil-free, and it seems more likely that they're going to have to make either a disclaimer right on the, on the cover that's, in order to avoid this, that says, but it's not really oil-free, or they're going to have to abandon the product altogether. Your Honor, I would, I would point out that the great weight of authority in this circuit and in the California courts is that the value is based on with representation and without. And on the representation, there were actually three— But is there any case like this one where the name of the product is actually the problem? Yes, Your Honor. Caro v. Proctor and Gamble. That's a California case from 18 California at 4662— Want to tell you one? What? Want to tell you one? Is that one? This is Orange Juice. Yes. And the name of the product had the word fresh in it. And the allegations—actually, this case, that case is very apt for this one. The allegation was fresh conveyed, like this case, multiple messages, and the claimed plaintiff, as in this case, testified that it wasn't false as to him. He claimed fresh conveyed premium and no additives. And in fact, he testified it was—that he did—understood it wasn't premium. And in that case, the court refused to apply any presumption of materiality because it members of the class would overwhelm the common issues because it wasn't false as to them. That is here. Here, the plaintiff herself alleged and—alleged that there were three messages, a performance claim of oiliness and two claims about whether these sort of technical disputes over whether the ingredients were oils mattered. But as to her oiliness and as to the undisputed evidence showed the message of the class, it was not false. It was a great product at a great price that performed as she expected. And so here, there was no question that could be answered in one stroke the way the cases require. You're switching gears now. You're talking about materiality. I'm talking about both falsity and materiality. Falsity, depending on what message the individual consumer took away, as Ms. Newhey's own testimony showed, depending on what message she took away, it would not—only not necessarily be false, but it might not—it might not be false or it might not be material. It's too complicated. As for—this case is much more like Fairbanks or Sterns or Vioxx where something negated that other message or that the consumers were not taking the message away that the plaintiff alleged was false. So in some of those cases, there were people saying something here. Not only was oil free as a performance claim, not greasy, wouldn't cause zits, all those aspects, not only was that message one of the main messages that many people took away, including Ms. Newhey herself, but also that their experience, repeat purchasers would buy it and they'd say, this is a great product. It feels great. Counsel, did you want to request some time? I do. Okay. Yes, Your Honor. All right. Thank you. Good morning, Your Honors. And may it please the Court, Adrienne Bacon on behalf of Plaintiffs' Court. And the certified class, I'd just like to start by thanking you for missing out on the eclipse today to be here. This case is a narrow rifle shot. We've got a single product in a single state where the name of the product that's in the biggest, boldest letter on the face of the packaging intended by the company to be material to people is allegedly false. It's not an oil free product. It contains soybean oil derivatives and palm oil derivatives as alleged and as substantiated by our expert. And so the question here is a twofold one, which is very simple. Is that most prominent name of the product claim on the face of the label material? I want you to go to their main contention, their main beef here, right? What's their main beef? Their main beef is this, that you need Dr. Frentz, an analysis of Dr. Frentz, and although you only really put forth Dr. Roberts' testimony, that there wasn't an in-depth review of that opinion, et cetera, et cetera. This Court has never required that and Comcast doesn't require that. Let's start by peeling back the layers of the onion of Comcast, and this Court's done it several times. In fact, Judge Prezant, you've presided over a couple of those opinions. Damages are a post-certification issue. This Court has said that many times, including in the Pulaski and Middleman v. Buick case. I didn't quite hear that. What is a post-certification issue? Damages are a post-certification issue. Alleen also says several times that damages doesn't have to be proven on a class basis anyway. I kind of wondered about that, but I gather that you're endeavoring to do that. We are endeavoring to do that, and there's plenty of cases that say that you don't have to do that, including the Tobacco II case out of the California Supreme Court, which is incorporated into Stern's and all the decisions after that. As for our UCL claim, we do have to show damages on a classified basis, but it's inferred when you have such a bold, prominent misrepresentation on the face of a label that is clearly material. And so, the reason that I raise materiality is because the question about predominance Is the UCLA the claim that doesn't have damages anyway, that only has injunction and restitution? That's absolutely correct, Your Honor. UCL does not require. You have to prove damages when you don't even have to prove damages. We don't even have to show it, but we do have to show some method in order to get a result at trial, obviously. Well, but to get restitution just means you give them their money back, so that issue doesn't even arise under the UCLA, as I understand it. That's absolutely correct. It's a restitutionary claim, and under Tobacco II, we don't have to show that. We just have to show a general deception to the general public, not necessarily any damage that is suffered by any particular consumer. But going to commonality, I just want to point to a grievous error in defendants' analysis, which is that they say that the court had no evidence of materiality and had to look at our survey to prove that. That's not true. On top of the fact that it's on the label, on the biggest, boldest print, that it's the name of the product, you've also got the biggest complaint from customers about the product being that it's oily and greasy. Counsel, I want to get you back to my question. Okay. Sorry. My question was their question, which is the experts. Explain to me why the court shouldn't have conducted a specific Daubert analysis with regards to Dr. Ferencz and that you've only included Dr. Roberts. There's several reasons for that, but the most obvious is the one that Your Honor pointed out at the onset of the hearing, which is that they never filed a Daubert motion requesting that our expert be stricken. The court doesn't have to strike an expert if it's not ever asked to. But they did file a motion with regard to the admission of evidence, and they mentioned Daubert and Daubert concepts. They filed objections. That's true. And those objections... But what's the difference? I mean, they didn't specifically ask for a hearing, but they did object on Daubert grounds. They didn't ask for relief, affirmatively. They objected to the admission of the evidence. The court considered those... So the relief they were asking for was not to admit the evidence. But the district court considered those in its order, and the question comes down to an abuse of discretion. Was it an abuse of discretion for Judge Hatter to allow the evidence to go through at this phase of the case? Was it an abuse of discretion for him to... Well, they're saying yes, because the expert with the big opinion is the secondary expert. This misconstrues the nature of what this survey and what Dr. Roberts' testimony are All these pieces of evidence are meant to do is satisfy, at this stage, Comcast. And what Comcast requires is that we have to put forth a proposed methodology that is tied to the theory of liability in the case. But what bothers me the most is that the questions are not set out. And so it's very hard to judge whether the question of the population universe seems less troublesome. It doesn't seem that difficult when you have records, but whether the survey is going to survey anything useful depends on what you're going to ask for. I have no idea. Well, we do have some idea. We have a pretty good idea of what's being asked. He did lay this out in an 18-page report. And I can tell you this because, again, I'll speak at a turn because this is in the record. We've done the survey at this point because the class has been certified. So I know exactly what is being asked. I can speak to that a little bit. Do you have another case, a modern case, in which, since all these rules were laid out, in which a class was certified with this little information about how the study is actually to be done? There's not a circuit-level case with respect to conjoined surveys or the type of consumer survey that we're talking about in this case. But there are plenty of cases that this Court has held we don't need to present a damages model. But we don't need to run the damages model. We know that. We don't need to present it. I don't know. What case says you don't need to present the model? Well, we did present the model, though. We presented that this was going to be a both qualitative and quantitative study. The qualitative portion would happen first. That would consist of focus groups of between— What about this question that they're raising about, was he going to ask them—was he going to have this reveal and ask them after the reveal, now what would you pay for it? Or was he going to ask them simply, what would you pay for this product like this way and what would you pay for this product this way without the oil-free claim on it? Those are quite different ways to do it. He seemed to say he was going to do the first. He seems to have repeated that quite a lot. So maybe as to particularity, there isn't a problem there. And I don't know what you ultimately did, but that does seem to be what he's saying he would do. Is that a problem? Well, it's not a problem unless or until the defendant raises that problem in a Daubert motion with respect to the specific questions as they were asked to people, which isn't before this Court. Why not with respect to the questions that were going to be asked to people, which they did raise? I think there's a lot of hyperbole being stated with respect to— There is a lot of hyperbole. I agree. But they did at least target that particular problem, which they think is a problem. As I say, I think it's consistent with the complaint, and I don't know why you're tied into the other system necessarily. But they did target it, and so the question is whether that distinction, whether he committed to doing it that way and we're supposed to judge it on that theory or we're supposed to say we don't know which one it was going to do. When we deposed Dr. Rebstein, who was the main expert who critiqued that issue with Dr. Roberts' report, he said that those issues could be controlled for in the survey. And we believe we've done that satisfactorily. So I don't think it's an issue. I think this is a couple of lines that have been blown out of proportion with respect to this idea of the big reveal. But keep in mind, part of the harm in this case, as Your Honor has mentioned in our complaint, is the fact that there's a loss of confidence in the market and consumers lose confidence in the product when they learn that the reason that they bought it was based on a lie. So I don't think that it's a noncognizable form of injury to suggest to people, you've been lied to, how much did that affect you? Now, you can ask that question in a way that limits bias, and we think that Dr. Roberts will oversee the survey that's doing that. We've given instructions for everybody to make sure to limit that bias as much as possible. But the structure of proposing an idea where you present a product with a false statement on it, ask people about that product, ask a series of open-ended questions to determine how they believe that it's important, and then narrow those questions to a targeted survey sample group and ask more targeted questions, and then do the same thing with respect to... But why, I mean, why shouldn't the requirement be one step further on than what he did? Here's, here's... I mean, we understand, you know, in other words, that he really at least needed to lay out what was he going to ask and how is he going to choose the population, and not actually do it, and not, and so on. But just my somewhat untutored perception is that this case is something of a, on the margin, in terms of cases in general, in terms of how much is actually shown at this point. And your main concern seems to be the cost of it, but it doesn't seem like it would be all that costly, if that's even a legitimate consideration, to at least give us... Because, because the way you've done it now, now he's done a survey and now you're going to have, now they're going to have to go back and the judge is going to have to say, well, they're going to complain about the survey, and it may turn out that the survey doesn't work because the questions were asked in some way that skewed the survey. And why shouldn't we say you at least have to do that much? That's no different than how class actions have been going for the past 20 years in California district courts under this court's guidance. The vast majority of district court opinions have never required more than what we did in this case. Well, that's why I asked you to, so can you point me to one or more cases like that? Yes, we cited many in our brief. There was a case which Judge Koh oversaw up in the Northern District, I think, involving Kellogg. I believe it's that Hadley case. And there are others which I can pull out of our brief. And I'll look for that while I'm doing double duty and answering one of the other points you raised, Judge Berzon. This expert survey, and I know this because we have the bills, costs $389,354.80. This court is being asked to draw a line somewhere. That's why I'm trying to be very specific. I'm not saying you should have had to run the survey. I mean, that's expensive. But writing five more pages, I bet I would ask this question and that question, and this is how I'd find the population. That's not how the process was designed. Let me explain how this proposal from Dr. Roberts actually works in practice and why that's not quite as feasible as Your Honor is suggesting. There's two approaches here that have to happen sequentially. First, you run a qualitative analysis. And what the qualitative analysis, as Dr. Roberts laid out, proposes is that there are focus groups, three to four people, in some cases six to eight, depending on the sample size that is drawn. And you bring these people in and you ask them open-ended questions about the product, how they feel about it, what their impressions are. Think about what you traditionally envision when you think of a focus group that a company is running. And you run that with several dozen consumers in different focus groups that are overseen by moderators. Those questions are also overseen by Dr. Roberts and observed. And then, after this happens, which takes a couple of months to develop, then you go to phase two, which is the quantitative portion, which is what defendant wants us to put together before we certify the class, which is the actual questions that get asked to people. There are several hundred thousand dollars worth of expert expenses and groundwork and legwork that have to go in before you get to the quantitative phase of the survey, which is afterwards. So what they were asking Dr. Roberts to do in his deposition is to just make up questions without having done the homework first of actually going and doing the qualitative survey. And that's not how his proposal works. You have to do these in tandem with one another. You can't just say, well, you need to tell us what questions you're going to ask. That presupposes that you know what the questions are going to be. The questions are derived from the focus groups, which is part of the same study. After the class cert stage, could they still come back and challenge the experts and the analysis? Absolutely. Judge Hatter left discovery for experts and for merits issues and for summary judgment and for damages wide open as a result of stipulated orders that the defendant stipulated to. Four times we allowed for this in the schedule. So what they're effectively saying is that it's an abuse of discretion for Judge Hatter to have done that, to have allowed them the opportunity to come back after the survey is done and file Daubert motions. And then if they're successful, asking for the class to be decertified. This typicality issue that they're raising with our client, the best way to handle that would be if the court, the district court, ultimately decides that Judge Robert's proposed methodology, as it was implemented, is not sufficient under the Daubert standards and they strike his expert report, the defendant could decertify the class and say, Ms. Newhey, your claims are too individualized. You don't have any sufficient method under Comcast of determining damages. And then the case would effectively be relegated to an individual case worth four or five dollars plus whatever attorney's fees we would get. Any additional questions? None. Yeah, I do have a question. There are a couple of related cases currently in the court, one of which has been argued, I think, which you've acknowledged. And the one that's been argued has, under our court rules, priority with regard to the issues decided. Should we be awaiting the issue in that case? Well, I wouldn't presume to know whether different panels talk to each other, but I do think these issues... And they talk to each other to the degree of finding out whether they're going to decide the issues. I think that these are incredibly interrelated. I watched the oral argument on that case. I've read their briefing. I think the legal and factual issues are very similar. The only difference is that we have this scheduling order issue, which makes our case an even easier case for you to uphold this class certification ruling, because in their case, they didn't do the survey either. Is the same question with regard to the stage at which the methodology was exposed in that case? And is it at basically the same stage? There's a subtle procedural difference, which I think is very important, which could potentially be a scenario in which there's a reversal in that decision and it's upheld here, which would be the fact that the scheduling order in their case had concluded discovery, whereas in this case, it has not. And so if this court were to find that important procedurally... Right, but you do think they're closely related. Otherwise, they're almost the same case. In fact, I think the questions which you asked, Judge Berzon, with respect to our survey questionnaire were presented almost identically in the other matter. And so... Well, that's helpful to know. So I don't think that we're in a different posture with respect to the Rule 23 factors right here, or Comcast, or these materiality issues. And they did raise both in the other case. Thank you, counsel. Thank you. Counsel, I'll give you two minutes. All right, Your Honor. Can I follow up on exactly what the last question was that Judge Berzon asked? What's your view of the issues that are before the other panel? There are some differences and some similarities. There is no damages mismatch error in that case, the way there is here, where on the face of it, they're measuring the wrong thing under Reitman versus Champion Foods, for example, and Pulaski and Kwikset. The expert in that case said, I'm going to do a conjoint. That's it. That's all he said. There was, and it was, after completely the close of discovery, not just there was more discovery going to be happening. I mean, it was completely shut down. So those may lead to some different scenarios. And also the defendant argued differently. There was a lot of confusion as to whether there was a bright line rule being advocated for, which we have very clearly not advocated for here. As to what? A bright line rule as to whether they had to run the model. Okay, a few points. First on Judge Mendoza, your original question, why no Daubert hearing? We did have a hearing. It wasn't framed as a Daubert hearing, but it was a hearing set for the, we didn't hold the hearing. There was a hearing scheduled, noticed. You're using hearing in an interesting way. Okay, there was no evidentiary hearing as to the qualifications of the expert, asked for or held. That's correct. We noticed. Or scheduled. There was one that was noticed for August 15th, and the judge took it under submission. But that was an oral argument. It was just an oral argument. Your Honor, there is no obligation for a district court, there's no rule that a district court has to hold a Daubert evidentiary hearing. But as to whether you ever asked for what we would call a Daubert hearing, the answer is no. The answer is no. There was no request for a Daubert hearing, but we did ask to be heard before the court in a noticed motion on our evidentiary motion, on our evidentiary objections. But you agreed that there's a difference between briefing an issue and asking for oral argument and asking for testimony to be taken to test the qualifications of the expert. Here, there was so little evidence. Actually, before the court, there's a lot of filler that there was not substantially a difference. You did the former, not the latter. We did the former. You wanted to argue based on your papers. You did not ever ask the judge to bring evidence, live testimony before the court to make the Daubert determination. That's correct, Your Honor. Counsel, you're out of time. Thank you so much for your arguments today. I appreciate both counsel's arguments today. Thank you.
judges: BERZON, MENDOZA, Bolton